## SHIELD v. FIRST COLEMAN NAT. BANK OF COLEMAN.

No. 9046.

Court of Civil Appeals of Texas. Austin.

May 22, 1940.

On the Merits Feb. 11, 1942.

Rehearings Denied March 4, 1942.

J. W. Chancellor, Donald & Donald, and Joe H. Cleveland, all of Bowie, and Baker & Baker, of Coleman, for appellant.

E. M. Critz, of Coleman, for appellee.

McCLENDON, Chief Justice.

The trial court being one whose term was limited by statute to five weeks, Acts 1939, 46th Leg., H.B.No.341, Sec. 2, Chap. 10, p. 171, Vernon's Ann.Civ.St. art. 199, District 119, it was necessary

that appeal bond be filed "within twenty days after the expiration of the term." R.C.S. Art. 2253, as amended by Acts 1927, 40th Leg., p. 21, Chap. 15, Sec. 1, Vernon's Ann.Civ.St. Art. 2253; Webster & Son v. Lucas, 117 Tex. 64, 296 S.W. 1089; Haralson v. Wheeler, Tex.Civ.App., 57 S. W.2d 248.

The term expired February 10, 1940. The appeal bond was not filed until March 7, 1940. It was therefore filed too late.

■ Filing of the bond within the statutory time is jurisdictional and cannot be waived. Neither can jurisdiction be invoked by agreement of the parties, 3 Tex.Jur., p. 326, Sec. 224. Nor can jurisdiction be conferred by consent or waiver of objections, 3 Tex.Jur., p. 80, Sec. 33.

■ It appears, however, from appellant's replication to the motion that appellant filed a pauper's oath under Art. 2266, on February 28, 1940. On the same date the clerk and appellee jointly filed a contest to the affidavit. This was set down by the court for hearing on April 4, 1940. In the meantime the pauper's oath and contest thereof were withdrawn by attorneys representing appellant and appellee, and no hearing was actually had on the contest. This withdrawal appears to have been under mutual mistake of attorneys for the respective parties that appellant had thirty days in which to file the appeal bond, and that its filing on March 7th was in time. Under these circumstances, we are entering an order giving appellant thirty days from this date within which to perfect the record so as to show jurisdiction of this court under the pauper's oath. This showing should be by certificate of the clerk, including the pauper's oath, the contest thereof, the hearing of the contest, and the judge's finding thereon. This will, of course, necessitate a resetting of the contest for such hearing.

#### On the Merits.

BAUGH, Justice.

The First Coleman National Bank of Coleman, hereafter designated as the bank, sued I. O. Shield and Ema Shield, independent executrix of the estate of Leon L. Shield, deceased, to recover a deficiency judgment against each of them for 9/25 of a balance claimed to be due said bank on a series of notes, secured by a deed of trust on real estate in Coleman Coun-

ty, after all credits on said notes had been allowed from proceeds of the sale of the lands by the substitute trustee. Ema Shield was dismissed as a defendant, the case tried to a jury, but they were discharged at the close of the evidence, and the court later rendered judgment for the bank against I. O. Shield for $5,048.25; hence this appeal.

The case arose as follows: On November 22, 1929, Leon L. Shield, Elgean Shield, Camille Shield Wallace, I. O. Shield, and Shield Brown, joined by their respective spouses, and joint owners of 2,576 acres of land in Coleman County, borrowed from the Ketcham Mortgage Company $32,000, evidenced by their joint execution of six notes, the first five for $3,200 each and the sixth for $16,000, due, respectively, on January 1, 1931, 1932, 1933, 1934, 1935, and 1940, and all secured by a deed of trust on said 2,576 acres of land. These notes were transferred to the Kansas City Life Insurance Company in 1930. They also executed at the same time another note for $3,160, secured by a second mortgage on said lands. The first three of the $3,200 notes were paid.

On September 11, 1933, Leon L. Shield executed another deed of trust on his 9/25 interest in said lands to secure a large additional separate indebtedness he owed the bank. Leon died testate on May 25, 1937, devising all his property to his wife, Ema Shield, appointing her independent executrix, and she qualified as such. The bank acquired Leon's 9/25 interest in said lands by trustee's sale on September 7, 1937; and additionally by deed from Ema Shield, as independent executrix, dated September 4, 1937.

Thereafter the bank acquired, on October 25, 1937, the second lien note executed by the Shield heirs on November 22, 1929; and on February 24, 1938, acquired by assignment from the Kansas City Life Insurance Company the remainder of the first lien notes. It thereupon appointed as substitute trustee its vice president, who advertised and sold under the powers given in the original deed of trust, the 19/25 interest of the other Shield heirs, bid same in itself at $10,000, which it credited on the aggregate indebtedness acquired by it, thus reducing same to approximately $22,000. This foreclosure by deed of trust sale occurred on April 5, 1938. On October 13, 1938, the bank conveyed to Elgean Shield and wife and Karl

Wallace and wife the lands in question, who executed vendor's lien notes for the aggregate sum of $32,000, the total amount the bank had expended, which notes were, as a part of the same transaction, assigned by it to agreed purchasers thereof, and the bank received the proceeds thereof.

Thereafter, this suit was filed by the bank against I. O. Shield to recover the claimed deficiency. The defendant Shield pleaded, among other things, want of necessary parties, in that all the joint makers should have been sued; novation of the original loan contract by the manner in which the bank and Elgean Shield and Wallace purchased the land from the bank after the latter had bought it in at trustee's sale; that the bank after purchasing Leon L. Shield's interest became a cotenant with other Shield heirs, and could not purchase for its own benefit, to the prejudice of appellant, the interests of its cotenants; that release of part of the joint makers from these notes released all; that by the purchase of Leon L. Shield's interest in the lands it became jointly liable on these notes then held by the Kansas City Life Insurance Company and upon payment thereof it was entitled only to contribution from the other joint makers; and that the foreclosure by sale under the deed of trust and resale of these lands to Elgean Shield and Wallace was fraudulent as against I. O. Shield, who held second lien notes against these lands, and was done for the purpose of defeating his right of redemption and to destroy his lien thereon.

At the close of the bank's evidence Shield moved orally for an instructed verdict. Though the record does not so disclose, it appears manifest that at the close of all the evidence, the bank made a similar request. The court thereupon dismissed the jury and subsequently rendered the judgment here appealed from.

■ It is manifest that whatever rights to a deficiency judgment the bank had were referable to the original notes and deeds of trust executed in 1929. It was agreed that the bank had released all the joint makers except I. O. Shield. Early cases hold that the release of one maker of a joint obligation discharges all. Bridges v. Phillips, 17 Tex. 128; McIlhenny Co. v. Blum, 68 Tex. 197, 4 S.W. 367; Wills Point Bank v. Bates, 76 Tex. 329, 13 S.W. 309. Such appears to be

the general rule prevailing in many jurisdictions. See Annotation 53 A.L.R. 1421 et seq. However, it has been abrogated by statute and no longer prevails in Texas. Bute v. Brainerd, 93 Tex. 137, 53 S.W. 1017; McDonald v. Cabiness, 100 Tex. 615, 102 S.W. 721; Tinkham v. Wright, Tex.Civ.App., 163 S.W. 615; Lipe v. Webster, Tex.Civ.App., 278 S.W. 246; 32 Tex.Jur., § 24, p. 42; 26 Tex.Jur., § 427, p. 154; R.C.S. Arts. 1986 and 2087.

■ Nor did the estate acquired by the bank through the purchase at trustee's sale of Leon L. Shield's %5 interest in said land in 1937, merge with that acquired by it when it acquired the notes and the lien securing them from the Life Insurance Company in 1938. The separate lien, foreclosed by sale in 1937, created by Leon Shield in 1933 on his interest was entirely distinct and separate from that created in 1929 by the joint contract, and secured Leon's separate individual indebtedness to the bank. Title acquired by the bank under it while the superior lien was still outstanding in the Kansas City Life Insurance Company was, of course, subject to that lien. And the bank, after it acquired the notes and lien from the insurance company so treated it, and subsequently foreclosed the latter, clearly showing an intention not to treat such estates as merged. Consequently there was no merger of such estates by the purchase of the title in the one instance and of the lien on the same land in the other, and no discharge of the lien so purchased. North Texas Building & Loan Ass'n v. Overton, 126 Tex. 104, 86 S.W.2d 738; King v. Hampton, 131 Tex. 85, 113 S.W. 2d 173, 174; Cooper v. First State Bank, Tex.Civ.App., 121 S.W.2d 399; 17 Tex. Jur., § 27, p. 122.

■■ Under the rules announced in the decisions above cited, the bank was not required to sue all of the makers, all being jointly and separately liable for the whole of the indebtedness; but could sue any one or more of them. I. O. Shield, if he were prejudiced by such suit, could have impleaded the others, and would have been entitled to contribution from them for any excess amount he was compelled to pay. Since, however, he was sued for only %5 of such deficiency, under allegations, which were supported by proof, that such fraction was the extent of his interest in the lands; and that he received

this fractional part of the moneys borrowed from Ketcham Mortgage Company, we fail to see wherein he was prejudiced.

It is also clear, we think, that purchase by the bank of the notes held by the Kansas City Life Insurance Company, in order to protect equities the bank already held, and other indebtedness held by it against all the makers including I. O. Shield, cannot be deemed a payment by the bank of such notes, so as to relegate it to contribution only against other makers. It was not so treated nor intended either by the bank or the life insurance company. The bank was consequently authorized to take whatever steps to collect the unpaid notes the life insurance company could have taken.

If, however, after the bank acquired said notes and liens, any one or more of the joint makers thereof, through refinancing said indebtedness, with or without the cooperation of said bank, had paid off the total amount thereof and reimbursed the bank in full, there would have been no deficiency. And this would be true whether the refinancing by such makers of their indebtedness against the lands in question be accomplished through procuring a third party to take over such indebtedness directly from the bank; or by renewal or extension thereof with the bank itself; or by agreed foreclosure and sale under the deed of trust, vesting of title to the lands in the bank with the understanding that the bank reconvey the lands to some of the original makers. If either of the foregoing methods had been used, and the bank made whole, there could be no deficiency as to it.

And the facts and circumstances shown were clearly sufficient to sustain a jury finding that the last-mentioned method of refinancing the original indebtedness was what was done. While the foreclosure under the deed of trust occurred in April, 1938, and the deed from the bank to Elgean Shield and wife and Camille Shield Wallace and husband was not executed until October, 1938, Gray, vice president of the bank and substitute trustee under the deed of trust, who handled the entire matter, testified to conversations, negotiations, and efforts on the part of Elgean Shield and Wallace, with his approval, not only before but after the foreclosure sale to the bank, whereby the bank could be made whole on its debt, and the lands turned back to the Shield heirs. These lands were valued at $30 per acre, or more than $75,000. The total amount of the indebtedness held by the bank was about $32,000. It bought in the 19/25 interest in the land on a bid of $10,000, which it credited on the notes. Shortly thereafter it resold the same lands to two of the original makers of these 1929 notes, all on credit, for the amount of its debt against all of the Shield heirs, these purchase-money notes were immediately transferred to parties who had agreed in advance to purchase them, and the bank under the undisputed testimony was repaid all the money it had been out in connection with the various transactions connected with the 1929 loan. From these facts and circumstances the jury could clearly have concluded that the foreclosure by the bank, conveyance by the trustee to it, the resale by it to Shield and Wallace at a consideration evidenced wholly by notes, and the immediate assignment thereof to prearranged purchasers, were merely steps in a single undertaking whereby the original indebtedness was taken up and extended and the bank made whole. If it was, then the bank suffered no loss and there was no deficiency to be recovered by it from anyone.

Nor can it be said that appellant waived a jury and agreed to have all these matters submitted to the court for determination, as was done in Fry v. Harkey, Tex.Civ.App., 141 S.W.2d 662. The statement of facts and the recitals in the judgment as to the contentions of the respective parties indicate, not a waiver of a jury, but the contention by each party that he was entitled to an instructed verdict on the facts proven, and amount only to a request by appellant at least to that effect. It is now settled that motion of each party for an instructed verdict is not a waiver of a jury, and unless one party is, under the evidence, entitled to an instructed verdict as a matter of law the issues made should be submitted to a jury. Citizens National Bank v. Texas Compress Co., Tex.Civ.App., 294 S.W. 331, writ refused; Alexander Co. v. First Nat. Bank, Tex.Civ.App., 119 S.W.2d 718; Fry v. Harkey, supra. It is also true that a fact issue for jury determination may arise from undisputed evidence. Commercial Standard Ins. Co. v. Davis, 134 Tex. 487, 137 S.W.2d 1. Nor is there any material difference between the court instructing a verdict and rendering judg-

ment thereon; and in dismissing the jury and then rendering judgment. Cline v. Ins. Exchange of Houston, Tex.Civ.App., 154 S.W.2d 491, 493.

For the reasons stated, the judgment of the trial court is reversed and the cause remanded for another trial.

Reversed and remanded.